# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 28, 2010 at Knoxville

## STATE OF TENNESSEE v. THOMAS E. CAMPBELL

**Direct Appeal from the Circuit Court for Warren County**
**No. F11901     Larry Stanley, Judge**

---

**No. M2010-00666-CCA-R3-CD - Filed March 31, 2011**

---

The Defendant-Appellant, Thomas E. Campbell, was convicted by a Warren County jury of attempted child abuse, a Class B misdemeanor, and aggravated sexual battery, a Class B felony. He was sentenced to six months in the county jail for attempted child abuse. For aggravated sexual battery, Campbell was sentenced as a Range I, violent offender to ten years in the Tennessee Department of Correction. On appeal, Campbell claims that: (1) both convictions were not supported by sufficient evidence; and (2) his sentence for aggravated sexual battery was excessive. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the Defendant-Appellant, Thomas E. Campbell.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Thomas Miner, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Background**. Campbell was charged with two counts of aggravated sexual battery, one count of attempted aggravated sexual battery, and two counts of rape.

At trial, C. J. [1], the victim's mother, testified that she had two children, A. N., the victim, and K. J. Jimmy Johnson, K. J.'s father, lived with his parents. K. J. and A. N.

---

[1] For sexual abuse cases, the policy of this court is to omit the victim's name, as well as the names of the victim's immediate family members.

stayed with Jimmy Johnson on most weekends. Although A. N. had a different father than K. J., A. N. viewed Jimmy Johnson as a father-figure.

C. J. testified that she learned of the allegations against Campbell in November of 2008. She said A. N. was twelve years old at the time. C. J. had known Campbell for six or seven years. She testified that Campbell frequently visited Jimmy Johnson at his home. C. J. stated that one weekend, K. J. and Jimmy Johnson came to her house. K. J. told C. J. that "something had happened to [A. N.]." C. J. immediately called A. N. by phone and asked about the allegations. The next day, C. J. spoke with Campbell. Jimmy Johnson brought Campbell to C. J. 's place of employment. C. J. testified that Campbell admitted to the allegations made by A. N., and he apologized. According to C. J., Campbell claimed "he had fallen asleep and when he woke up his hands were in an inappropriate place, so he immediately got up and left." Campbell then started to blame C. J. for what had happened. C. J. said Campbell "suggested that I go to church regularly and I take the kids and straighten up[.]" C. J. continued, "Apparently [A. N.] had learned these things from me and she had tried once to put his hands on her waist, and she was learning things by watching me." C. J. contacted the police after speaking with Campbell.

On cross-examination, C. J. acknowledged that before she learned of the sexual misconduct, she tried to enter a relationship with Campbell. She asked him out on two occasions, but he rejected her advances. C. J. admitted to sending sexually-suggestive pictures of herself to Campbell. C. J. testified that A. N. never lied to her in the past. C. J. was currently taking medication for seizures, depression, and her nerves.

Jimmy Johnson testified that he lived with his parents at the time of the offenses. On most weekends, K. J. and A. N. stayed with him. Jimmy Johnson testified that he had known Campbell for many years. They worked together, and Campbell was a frequent guest at his home. Campbell typically visited on Friday nights to watch television. Jimmy Johnson stated that K. J. and A. N. would sleep in a bedroom or on the couches in the living room. It was not unusual for the girls to fall asleep on the couches while other people, including Campbell, were also in the living room watching television. Jimmy Johnson said that the girls associated with Campbell when he visited and that they had a good relationship with him.

Jimmy Johnson testified that K. J. told him about the sexual misconduct. He immediately confronted Campbell. Campbell claimed "he had fell asleep and woke up with his hand where it shouldn't be, and he got up and left." Campbell also told Jimmy Johnson about another incident in which "[h]e had woke up with [A. N.] putting his hand somewhere it shouldn't have been, so he got up to leave." Campbell said both incidents occurred in the living room. Jimmy Johnson testified that after he initially confronted Campbell, they went to speak with C. J. at her place of employment.

On cross-examination, Jimmy Johnson testified that he had known Campbell for over ten years. He was aware of the fact that C. J. wanted to have a relationship with Campbell. He did not have a problem with their relationship because he thought that Campbell "was a good guy." Jimmy Johnson said A. N. and Campbell sometimes shared a couch. He believed they had a good relationship. Jimmy Johnson testified that there were no past instances consistent with the allegations of sexual misconduct. He did not recall A. N. ever doing anything that was sexually inappropriate. Jimmy Johnson was asked if A. N. had ever lied to him. He responded, "She is a child." He then acknowledged, without additional comment, that A. N. lied in the past.

A. N. testified that she was born on December 22, 1995. She referred to Jimmy Johnson as her father, and she stayed at his house on the weekends. A. N. testified that on a typical Friday night, she would watch television with K. J., Jimmy Johnson, and Campbell. They would stay awake until between midnight and 2:00 a.m. A. N. said she and Campbell sat on one couch while K. J. and Jimmy Johnson sat on the other couch. When it was time to go to sleep, she and K. J. would get the covers and go to sleep on the couch. A. N. said she had known Campbell for four or five years. She claimed they "got along pretty good." A. N. also had a good relationship with Jimmy Johnson.

A. N. was asked about the allegations set forth in count one of the indictment. She stated that one afternoon she was in the living room with Campbell and Jimmy Johnson watching television. A. N. and Campbell were sitting on the same couch. A. N. said she was sick, so she "crawled up" on one side of the couch. A. N. stated:

> Jimmy got up and left the room for a few minutes. I was almost asleep because I had a headache and I didn't feel good. Tom's hand came up the side of my leg and I wasn't really sure what he was doing. I kind of scooted back and it kept going. I didn't know what was going on. I thought maybe it had been an accident before it got to my waist.

A. N. testified that Campbell's hand ended up between her legs. She said he slid his hand up her leg and then stopped when it got between her legs. A. N. stated that Campbell's hand remained on the outside of her jeans right below her zipper. She claimed, "He slid [his] fingers up and down." A. N. stated that Campbell pulled his hand away when Jimmy Johnson returned to the living room. She did not tell anyone about the incident because she thought it might have been an accident. A. N. said this first incident occurred in the summer of 2007 when she was eleven years old.

A. N. was asked about the second incident set forth under count two of the indictment. She stated:

It was one of the Friday nights that we were watching wrestling. Jimmy had fell asleep, and so had [K. J. ], and I was laying [sic] on the other couch and I was almost asleep. Well, my phone started to vibrating and I got off of it, because I was texting people, and I set it up on the bookshelf and rolled over and fell asleep. I woke up to a hand underneath my shirt and my bra pushed up.

A. N. said she was wearing the clothes that she wore to school, which was a tee shirt, a tank-top, and jeans. She was covered by a blanket. A. N. testified that when she woke up, Campbell's hand was on her breast underneath her shirt. She said Campbell was awake. Jimmy and K. J. were also in the room; however, they were asleep. A. N. got up from the couch and went to sleep in another room. At that time, she had no discussion with Campbell about what happened. A. N. said she initially did not tell anybody about the incident because she was afraid of Campbell. She was afraid of Campbell because of his physical size and because he carried a gun.

A. N. testified about a third incident involving Campbell. This incident occurred between January and November of 2008. She stated:

I was laying [sic] on the couch and we were all watching TV. I tried to push him away because he was trying to unbutton my pants. I pushed him away and he got my hand and tried to pull it to him below his waist, and I kept trying to pull away. Then, I nudged him with my legs and he let go.

A. N. said Campbell touched her while she was under her covers. She believed that K. J. and Jimmy Johnson were also in the room. A. N. testified that her legs were bent and Campbell was sitting at the base of her feet. She stated that after Campbell pulled her hand to his thigh, she started to kick him. A. N. was able to free her hand and she ran to another room. A. N. recalled that K. J. was asleep in the living room while Jimmy Johnson was on the computer in a separate room.

A. N. testified about a fourth incident that occurred around spring break of 2008. She stated:

[W]e were all in the living room watching TV. That was our usual weekend thing. I was on one couch and [K. J. ] was on the other and Jimmy was on the couch that [K. J. ] was. I felt sick that night and I fell asleep. I woke up because I felt movement around the end of the couch and I didn't know what was going on. Then, whenever I finally came to, I found out that his hand was in my jeans trying to pull them down.

-4-

A. N. said she asked Campbell what he was doing, but he did not respond. She testified that his hand went inside of her pants, and he touched her skin. Campbell moved his hand around; however, he did not penetrate A. N. A. N. said Campbell was not able to pull her pants down. She got up from the couch and sat next to K. J. K. J. woke up when she sat down. A. N. testified that it was around midnight when the incident occurred. She said Jimmy Johnson was not present.

A. N. described a fifth incident that took place in November of 2008. She testified that she fell asleep on the couch after watching a movie. A. N. woke up when Campbell sat down next to her feet. She then went back to sleep. A. N. woke up again and Campbell had his hand down her pants. She said he was digitally penetrating her. A. N. asked Campbell what he was doing, and he remained silent. She then got up and left the room. A. N. said K. J. was asleep on the other couch while Jimmy Johnson was sitting on the floor watching television. The next morning, A. N. told K. J. what had occurred. A. N. later told her mother about some of the sexual misconduct. She did not tell her mother everything because her mother became extremely upset. A. N. said her mother contacted the Sheriff's Department and set up an appointment with the Children's Advocacy Center. A. N. testified that all of the incidents of sexual misconduct occurred when she was eleven or twelve years old.

On cross-examination, A. N. testified that she had known Campbell for six or seven years. She described him as being "a nice guy" before the sexual misconduct. A. N. was aware that her mother wanted to date Campbell. When asked if she wanted them to date, A. N. answered, "Not really." A. N. said she was concerned about disclosing the sexual misconduct because she was afraid of Campbell. On redirect examination, she added that she was also worried that nobody would believe her because she was a child. A. N. said she was afraid that Campbell might kill her. She stated, "He said that he would bring his gun out on anyone that did something. I was afraid that if I said anything that he would have brought it out on me." On recross-examination, A. N. acknowledged that Campbell had never personally threatened her.

K. J. testified that she had a good relationship with both A. N. and Campbell. She had known Campbell for six or seven years. K. J. did not witness the sexual misconduct. She testified that in November of 2008, A. N. told her what had occurred. A. N. "was crying and she wasn't sure what to do." K. J. told her parents about the sexual misconduct. She had not known A. N. to lie in the past. K. J. testified that she was never threatened by Campbell, and he did not make any sexual advances towards her. K. J. said Campbell possessed a gun "[e]very time he came over." The gun was kept either in the saddle bag of his motorcycle or on his hip.

Bo Ramsey testified that he was an investigator with the Warren County Sheriff's Department. He interviewed C. J. during his investigation. C. J. reported that Campbell

admitted to the allegations. Investigator Ramsey also interviewed Campbell. When asked to recall the substance of the interview, Investigator Ramsey stated:

> I recall in the first interview [Campbell] stated that he was asleep and when he woke up his hand was in a location that it should not be. When questioned about where is it that it should not be, he indicated that it was in the groin area towards the vaginal area of the female. He said at that time that he jumped up immediately, was surprised, and went outside and smoked a cigarette and he left because he had at that point thought that he had done it. Then, he began to tell me that he didn't think that he done it. That is why he went back after the four (4) week absence, or however long the absence was. Then, the second incident happened and he stated that she reached down and grabbed his hand and started pulling it towards the private area and he stated that when he felt hair that he knew that it was where it shouldn't have been. He stated that she had jeans on, but at some time she had pulled them off and was under a cover. That was his statement. He denied any touches to the breast because I did ask him about that. His excuse for it was that he did not do it intentionally, that he was asleep every time.

Investigator Ramsey said Campbell gave a written statement to the police. Investigator Ramsey testified that the written statement was a condensed version of what Campbell said during the interview. On cross-examination, Investigator Ramsey stated that he did not find any physical evidence. He did not record his interview with Campbell.

The defense called Campbell as its first witness. Campbell testified that he was fifty-three years old. He had been employed for thirty years in the nursery business. Campbell said he was a religious man who attended church every Sunday. He claimed he had no prior criminal record. Campbell denied that he used illegal drugs or alcohol. He testified that he and Jimmy Johnson had been friends for six or seven years. Campbell had known C. J. for about four or five years. He said she wanted to be in a relationship with him. Campbell stated C. J. sent him nude photos of herself over the phone. He rejected her advances partly because she used drugs. Campbell said C. J. used Hydrocodone and Valium.

Campbell testified that he first met A. N. on her twelfth birthday. He claimed they were friends. Campbell stated that on Friday nights he went to Jimmy Johnson's house to watch television. Jimmy Johnson lived with his parents in a single-wide trailer. The television was in the living room, which Campbell described as being fairly small. The living room had a small couch and a long couch. Campbell recalled two incidents at Jimmy Johnson's home that involved A. N. In describing the first incident, he stated:

> The first incident was one Friday night while I was sitting there watching TV. . . . I had dozed off. When I woke up, my hand was on her leg

-6-

on top of the cover. That scared me because I don't do kids that way. I don't do it. That hit me that I thought I might have done something in my sleep, so I left.

Campbell stated that when he woke up, his hand was on her outer thigh. He said he immediately left the house. Campbell testified that the second incident occurred about three weeks later. He stated:

[W]e started watching a movie. [A. N.] come from the computer into the living room carrying her blanket and got on the couch where I was sitting. She laid down a few minutes, and then she reached and grabbed me by the hand and pulled my hand up to her.

Campbell said he was scared by A. N.'s actions, so he went home. He testified that both incidents occurred in the winter of 2008. Campbell denied that he ever touched A. N. in a sexual manner or for sexual gratification.

Campbell acknowledged that he had a gun holder's permit. He did not carry the gun with him at all times. Campbell said he brought the gun into Jimmy Johnson's home on one occasion; however, he stated, "They acted like they didn't like it, so I didn't ever do it again." Campbell denied making any threatening gestures toward A. N. He said he never returned to the Johnson's home after the second incident.

On cross-examination, Campbell further discussed the first incident in which he touched A. N. Campbell said his hand remained on the outside of her covers. Campbell did not tell Jimmy Johnson about the incident because he was scared. He described the second incident in greater detail. Campbell stated that A. N. sat down next to him on the couch and pulled her jeans down. She then grabbed his hand and pulled it under her blanket. Campbell said he felt her pubic hair. He testified that Jimmy and K. J. were also in the living room at this time; however, they were asleep. Campbell left the home without talking to Jimmy Johnson. He said Jimmy Johnson came to his house on the next morning and asked if something happened between him and A. N. Campbell stated that he told Jimmy Johnson about the two incidents. Campbell believed A. N. accused him of sexual misconduct because she knew he chose not to date her mother.

Eddie Johnson, Jimmy Johnson's father, testified that A. N. stayed at his house at least every other weekend. He confirmed that Campbell frequently came to his house to watch television. Eddie Johnson was not aware of any incident consistent with the allegations of sexual misconduct. He said A. N. did not tell him about the incidents. Eddie Johnson estimated that he had known Campbell for twenty-five or thirty years. He believed that Campbell had a good reputation and was truthful. Eddie Johnson did not have any ill feelings towards Campbell.

Dorothy Johnson, Jimmy Johnson's mother, testified that she was not aware of any sexual misconduct between Campbell and A. N. Dorothy Johnson said Campbell had a good reputation in the community and that he was a truthful person.

Sally Hillis, Angela McCarver, Bobby Muncie, Holly Deason, Dale Deason, Felicia McMullough, and Mary Lou Ward were called by the defense to testify about Campbell's character. They all testified that Campbell had a good reputation in the community and that he was a truthful person. Many of these witnesses did not know A. N., and some were unfamiliar with the facts of this case.

Following the proof at trial, Campbell was convicted of one count of aggravated sexual battery. For the charge of attempted aggravated sexual battery, he was convicted of the lesser included offense of attempted child abuse. Campbell was acquitted of the three remaining charges.

**Sentencing Hearing**. At the start of the hearing, a presentence report and a psychosexual evaluation were entered as exhibits. Matthew Panter of the Department of Probation and Parole testified that he spoke to Campbell while preparing the presentence report. He did not recall Campbell's showing any signs of remorse. Panter acknowledged that he did not specifically ask Campbell whether he was remorseful. He said A. N. did not complete a victim-impact statement. Panter explained that the statement might have been mailed to the wrong address.

C. J. testified that the offenses had a negative impact on A. N. C. J. stated:

> She became very distant. She didn't talk very much and she's always been a really talkative, really happy child. Her grades at school had dropped a little bit. She didn't go out and do normal things that like 12 year olds would like to do, like roller skating and movies and she also had continuous nightmares. She would come and directly wake me up, tell me what she had dreamt about. Most of them Tom Campbell's name came up and she told me and described me in all the dreams that she had had. And she has a huge fear that something will happen to her or a member of her family.

C. J. talked to A. N. about undergoing counseling. She said A. N. talked to a youth minister; however, she did not want to seek further counseling. C. J. testified that a threatening text message was sent about A. N. The message asserted that Campbell was innocent and that A. N. was a liar. C. J. could not remember the exact wording of the text message. She recalled that the text message instructed those who received it to make A. N.'s life extremely difficult. C. J. testified that A. N. also received threatening letters before and after trial. One of the letters quoted Bible verses and threatened that A. N. would pay for what she had done. The letter claimed that A. N. ruined the life of an innocent man. C. J. said A. N. saw

these letters. She did not know who sent the text message or wrote the letters. C. J. stated that A. N. expressed concern about testifying at the sentencing hearing.

A. N. discussed how she was impacted by the offenses. She stated:

I stopped being able to trust most of the people that I had talked to before. I kind of stopped hanging out with the people that I hung out with. The people at school, once they heard about the text message, they kind of turned on me and my real friends asked me about it. I started staying inside more. Tried to become closer to my family.

A. N. said she was approached by four people at school about the text message. She was unable to find the source of the text message. A. N. said she tracked it through seven people who had seen it. She had no reason to believe that Campbell sent the text message. A. N. testified that she saw four letters that were sent to her house. She said two of the letters were sent before trial. The last letter stated that "mom needed to watch over me and my sister because something was going to happen to us." A. N. said she had nightmares from which she woke up screaming and crying. She acknowledged that her mother wanted her to seek counseling. A. N. said she had not gone to counseling because she did not believe the counselors could relate to her situation.

Holly Deason, Angela McCarver, R.H. Bond, Sally Hillis, Dorothy Simmons, and Bobby Muncey were called to testify about Campbell's character. They testified that Campbell was an honest and decent man who was a valuable member of the community. Most of these witnesses believed Campbell was not guilty. Angela McCarver and Bobby Muncey wrote letters to the editor in the local newspaper which stated that Campbell was falsely accused. Eddie and Dorothy Johnson also were called to testify. They were unsure of whether Campbell was guilty; however, they continued to believe that Campbell was a good person.

Campbell again denied that he was guilty of any wrongdoing. He said he was not remorseful because he had done nothing wrong.

The investigation report prepared by the Tennessee Board of Probation and Parole states that no enhancing or mitigating factors were filed with the trial court. The report also shows Campbell did not have a prior criminal record. A psychosexual report was performed on Campbell by Crossroads Counseling Services. The report states, "His truthfulness score on sex-related items was in the maximum risk range indicating he attempted to minimize or conceal sex-related information." The report concluded that Campbell "had a significant number of cognitive distortions or irrational beliefs about sex that need to be addressed." It was recommended that Campbell complete a Sex Offender Treatment Program.

The record includes a copy of a text message that was sent from a cellular phone. It states that A. N. falsely accused a man of rape. The message states A. N. made up the accusations because the man would not go out with her mother. The message directs the recipient to resend the message to other people and to make A. N.'s life a "living hell."

The record also contains a copy of a handwritten letter that was sent to C. J. It states that C. J. and A. N. still have time "to make thing's [sic] right." The letter repeatedly threatens the lives of C. J., A. N., and K. J. The letter makes numerous references to the Bible.

At the conclusion of the sentencing hearing, the trial court issued its ruling. It noted that neither party submitted any enhancing or mitigating factors. The trial court then made the following findings:

> The Court takes into consideration the testimony of . . . the victim and her mother regarding the emotional impact that this has had on her, the fact that she has had nightmares regarding being abandoned and as I believe her mother said had nightmares involving the defendant. I do believe she has gone through a great deal in trying to overcome this along with dealing with the people in the community and her physical community and her social community, that the victim has undergone, according to her and her mother, a change in personality and has had to deal with very disturbing letters written to and about her and to and about her mother regarding these incidents.

> The Court finds that the victim has undergone substantial psychological damage because of what has gone on here. I believe that the victim was particularly vulnerable because of her age as to what happened but I think that is part of the conviction itself, that the child was of a . . . particularly young age. So that is not to be considered in sentencing.

> Again, I have taken into consideration all the testimony at the trial and today as well. The Court has considered the psychosexual evaluation that has been introduced into evidence by Dr. Netherton, Ph.D. who has, as Mr. Miner said, has some difficulty regarding his truthfulness regarding sexual behavior and sexual thoughts.

> The Court has taken into consideration the defendant's prior background and history and so forth, mental condition, physical condition, what he has done, where he was, who was involved, how all this took place, the necessity of prohibiting others from doing this in the future, type of offense it was, the relationship of the defendant to the victim, the defendant's remorse if any, his version of the events and so forth.

The trial court sentenced Campbell to ten years for aggravated sexual battery in the Tennessee Department of Correction and to six months in the county jail for attempted child misconduct. It ordered these sentences to run concurrently.

Campbell subsequently filed a motion for new trial, which was denied . He submitted a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence**. Campbell claims the evidence did not support his convictions for aggravated sexual battery and attempted child abuse. He argues that the convictions were based entirely on A. N.'s testimony, which was not credible. Campbell also contends there were fatal variances between the bill of particulars and the proof at trial. In response, the State asserts that questions of witness credibility are left to the jury and should not be second-guessed by this court. The State claims there were no material variances between the bill of particulars and the evidence at trial. The State also argues that Campbell has not shown any resulting prejudice. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and

the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

We will first address Campbell's conviction for aggravated sexual battery. The State was required to prove "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4) (2008). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6) (2008). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

Here, the evidence supported the conviction for aggravated sexual battery. The indictment alleged that the offense occurred between March 1, 2008 and April 30, 2008. There is no dispute that the victim was less than thirteen years of age at the time of the offense. A. N. testified that during her spring break in 2008, she was staying with Jimmy Johnson. Late one night, she fell asleep on the couch. A. N. said she woke up and discovered that Campbell's hands were inside of her jeans and that he was trying to pull her jeans down. A. N. testified that Campbell was not able to pull her jeans down. He did, however, place his hand inside of her pants. A. N. said Campbell made skin-on-skin contact and moved his hand around about two inches below her waist. A. N. testified that Campbell's hand was "[w]here it shouldn't have been." The foregoing evidence supports the conviction for aggravated sexual battery.

Campbell was also convicted of attempted child abuse, which can be a lesser included offense of attempted aggravated sexual battery. See T.C.A. § 39-15-401(f) (2008). The statute for child abuse prohibits the abuse of a child under the age of eighteen if the abuse adversely affects the child's health and welfare. T.C.A. § 39-15-401(b) (2008). Tennessee's attempt statute provides:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101(a)-(b) (2008).

In this case, the evidence supported the conviction for attempted child abuse. The indictment alleged that the offense occurred between January and November of 2008. A. N. testified that the offense took place during this period. She stated that one night, she was on the couch with Campbell. A. N. was already under her covers and was preparing to go to sleep. She testified that Campbell reached under her covers and tried to unbutton her pants. A. N. said she attempted to push him away. She testified that Campbell grabbed her hand and tried to pull it below his waist. A. N. said her hand went next to Campbell's thigh. She stated that she struggled to get her hand back and ultimately had to kick Campbell to free herself. The foregoing evidence shows that Campbell acted with the intent to abuse A. N. in a manner that would adversely affect her health and welfare. By trying to unbutton A. N.'s pants, Campbell clearly took a substantial step towards the completion of this offense.

The crux of Campbell's argument is that the aforementioned evidence is insufficient because A. N. was not a credible witness. He concedes in his brief that this "case boils down to [the victim's] word against Mr. Campbell's word." He refers to the absence of physical evidence supporting A. N.'s testimony. Campbell also points out that neither Jimmy Johnson or K. J. witnessed the offenses despite being present in the living room. He emphasized the numerous character witnesses who testified that he was an honest person. In particular, Campbell refers to the testimony of Eddie and Dorothy Johnson who continued to believe that Campbell was a truthful person. We recognize the arguments made by Campbell; however, we cannot override the jury's credibility determination. By convicting Campbell, the jury clearly rejected his account of what transpired. The jury is entrusted with judging witness credibility, and we are not permitted to second-guess its decisions. See Odom, 928 S.W.2d at 23.

In challenging the sufficiency of the evidence, Campbell's final argument is that there were fatal variances between the bill of particulars and the proof at trial. Campbell claims A. N.'s testimony differed from the facts set forth in the bill of particulars in several respects. For the attempted child abuse, the bill of particulars did not allege that Campbell tried to unbutton A. N.'s pants. Instead, it asserted that Campbell placed his hand on A. N.'s thigh. For the aggravated sexual battery, the bill of particulars alleged that A. N. was wearing

pajamas, rather than jeans. It also asserted that Campbell digitally penetrated A. N., which she denied at trial.

Although we recognize the variances presented by Campbell, they do not warrant reversal of the convictions. See State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) ("A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial."). The purpose of a bill of particulars is "'to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial.'" State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991) (quoting State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984)). In order to be granted relief, the defense must "demonstrate prejudice in the form of unfair surprise or inability to prepare an adequate defense." State v. Sherman, 266 S.W.3d 395, 409 (Tenn. 2008) (citing Byrd, 820 S.W.2d at 741). Other than attacking the victim's credibility, Campbell has not set forth an argument explaining how his defense was prejudiced. Accordingly, he is not entitled to relief on this issue.

**II. Sentencing**. Campbell claims his ten-year sentence for aggravated sexual battery was excessive. He argues that the trial court failed to set forth any explanation for sentencing him above the eight-year minimum. Campbell also asserts that the trial court improperly considered the vulnerability of A. N., which was already taken into account as an element of the offense. In response, the State claims the trial court did not in err in sentencing Campbell. It asserts that the trial court properly considered the impact that the offenses had on A. N., the results of the psychosexual evaluation, and Campbell's relationship to A. N. Upon review, we conclude that the ten-year sentence was not excessive.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2008). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Our review is de novo, without a presumption of correctness, if the trial court applied inappropriate mitigating or enhancement factors or otherwise failed to follow the principles of the Sentencing Act. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The defendant, not the State, has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2008), Sentencing Commission Comments.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and

information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See T.C.A. § 40-35-210(b); see also State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Osborne, 251 S.W.3d 1, 24 (Tenn. Crim. App. 2007).

The Tennessee Supreme Court has stated that the 2005 Amendments to the Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. In sentencing a defendant, the trial court must consider the sentencing guideline that suggests an adjustment to the defendant's sentence when enhancement or mitigating factors are present; however, these factors under the guideline are merely advisory rather than binding upon a trial court's sentencing decision. Id.; see also T.C.A. § 40-35-210 (2006). The weight given to each enhancement or mitigating factor is left to the sound discretion of the trial court. Id. Thus, this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Campbell was sentenced as a Range I, violent offender to ten years in the Tennessee Department of Correction. The sentencing range for aggravated sexual battery, a Class B felony, is between eight and twelve years. T.C.A. § 39-13-504(b) (2008); T.C.A. § 40-35-112(a)(2) (2008). In sentencing Campbell to ten years, the trial court focused primarily on the "substantial psychological damage" suffered by A. N. It referred to the testimony that she had nightmares, experienced feelings of abandonment, had a change in personality, and experienced social condemnation. The trial court also considered the psychosexual evaluation, which strongly suggested that Campbell was untruthful about his sexual behavior. The trial court noted that A. N. was particularly vulnerable because of her age. It made clear, however, that A. N.'s vulnerability would have no effect on sentencing. The trial court did not state whether any mitigating factors were applicable under Tennessee Code Annotated section 40-35-113.

In viewing the record, the trial court did not err in sentencing Campbell. As stated above, we are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346. By stating that A. N. suffered "substantial psychological damage," the trial court essentially found that enhancement factor (6) was applicable under Tennessee Code Annotated section 40-35-114. Under this factor the court considers whether the personal injuries inflicted upon A. N. were particularly great. T.C.A. § 40-35-114(6) (2008). The Tennessee Supreme Court has recognized that personal injuries can include psychological or emotional injuries. See State v. Arnett, 49 S.W.3d 250, 260 (Tenn. 2001) (citing State v. Smith, 891 S.W.2d 922, 930

(Tenn. Crim. App. 1994)).   Although expert testimony is not necessary to prove psychological or emotional injury, there should be some "specific and objective evidence demonstrating how [the victim's] mental injury is more serious or more severe than that which normally results from this offense." Id. Here, A. N. and her mother gave specific and objective evidence of A. N.'s mental injuries. C. J. testified that A. N. suffered "continuous nightmares," most of which involved Campbell.   A. N. said she repeatedly woke up screaming and crying. C. J. testified that A. N. underwent a personality change in which she became introverted and no longer interacted with other children.   The testimony at the sentencing supports the finding that enhancement factor (6) was applicable.

Furthermore, the trial court was permitted to consider the information in the psychosexual report.  The trial court also explicitly stated that it did not consider A. N.'s vulnerability in sentencing Campbell.  We find no support for Campbell's claim that the trial court erred by imposing a ten-year sentence.  The sentence is consistent with the purposes and principles of the Sentencing Act.  Accordingly, Campbell is not entitled to relief on this issue.

**CONCLUSION**

Based on the foregoing, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE